## IN THE UNTIED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| WARREN G. LOW and THOMAS K. TKACH, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. CIV-18-305-SLP |
| OMNI LIFE SCIENCE, INC. and GEORGE CIPOLLETTI, | ) ) ) | |
| Defendants. | ) ) | |

## O R D E R

Before the Court is Defendants' Motion for Summary Judgment [Doc. No. 93].

Plaintiffs have responded [Doc. No. 102], and Defendants have replied [Doc. No. 115].[1]

Accordingly, the matter is fully briefed and ready for determination.[2]

## I.    Introduction

Plaintiffs are medical doctors who entered into identical Product Development and

Clinical Surgical Consulting Services Agreements with Defendant OMNI Life Science,

Inc.  Defendant George Cipolletti was OMNI's Chief Technology Officer.  Pursuant to

their agreements, Plaintiffs were to provide consulting services to Defendant OMNI related

to knee and hip reconstruction and replacement devices, in exchange for royalty payments

based on a percentage of net sales of the devices.  Plaintiffs claim Defendants failed to

---

[1] Citations to the record reference the Court's ECF pagination.

[2] Plaintiffs were granted leave to file a surreply to address specific evidence raised in Defendants' Reply, but Plaintiffs' Surreply was stricken for failure to comply with the Court's Order.  *See* [Doc. No. 128].

timely pay them royalties owed pursuant to the agreements, and that they made improper deductions in calculating royalties owed.[3]  Plaintiffs also assert that Defendants misled them regarding these payments.  After the Order on Defendants' Motion to Dismiss [Doc. No. 23], Plaintiffs' remaining claims are for breach of contract, fraud, negligent misrepresentation, and an accounting.[4]

Defendants have moved for summary judgment on Plaintiffs' remaining claims.  *See* [Doc. No. 93] at 6-8.  Defendants principally contend that Plaintiffs failed to perform their part of the contract by providing the consulting services for which they seek compensation, or that they failed to document any consulting services, despite a contractual obligation to do so.  Defendants alternatively contend that payments to Plaintiffs for consulting services they failed to provide would exceed the fair market value of the services and therefore violate 42 U.S.C. § 1320a-7b(b), the federal Anti-Kickback Statute.  For similar reasons, Defendants also seek dismissal of Plaintiffs' claims for fraud, negligent misrepresentation, and an accounting, in addition to the claims against Defendant George Cipolletti individually.

---

[3] The Court generally discusses Defendants together because Plaintiffs do not distinguish which claims are asserted against which Defendants.  *See* Am. Compl. [Doc. No. 9] at 6-20.

[4] Defendants asserted counterclaims for breach of contract, declaratory judgment, and return of overpayment/quasi-contract/unjust enrichment.  *See* [Doc. No. 62].  Defendants assert that they erroneously paid Plaintiffs for products that fell outside the scope of the Agreements, and that they discovered Plaintiffs breached the Agreements by failing to provide the requisite consulting services and failing to document those services as required.  Defendants also seek a declaratory judgment that the Agreements are terminated, and that they paid Plaintiffs in excess of what was owed under the Agreements.  Those claims are not presently at issue.

## II.    <u>Governing Standard</u>

A party is entitled to summary judgment if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is only material if it "might affect the outcome of the suit under the governing law."  *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The party seeking summary judgment "shoulder[s] the initial burden of showing that there is an absence of evidence to support the nonmoving party's case."  *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200 (10th Cir. 2022) (cleaned up).  If the movant meets this burden, the nonmovant must then "identify specific facts that show the existence of a genuine issue of material fact."  *Id.* (quoting *Clinger v. New Mexico Highlands Univ., Bd. of Regents*, 215 F.3d 1162, 1165 (10th Cir. 2000).  The Court "view[s] the factual record and draw[s] any reasonable inferences therefrom in the light most favorable to the nonmoving party."  *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

## III.    <u>Undisputed Material Facts</u>[5]

Plaintiffs, Drs. Low and Tkach, signed identical Product Development and Clinical/Surgical Consulting Services Agreements with Defendant OMNI effective January 1, 2006 and January 1, 2007, respectively (the "Agreements").  The initial "recitals" of the Agreements stated that Plaintiffs sought to "perform certain Consulting Services (defined below) and provide expertise, ideas, and know-how for the development

---

[5] The Court includes facts that are material, supported by the summary judgment record, and not genuinely disputed.  *See* Fed. R. Civ. P. 56(c).

of new and/or improved medical devices and related instrumentation for [Defendant]." [Doc. Nos. 93-1, 93-2] at 2.[6]

Section 2 of the Agreements provides—under "Duties and Responsibilities of [Plaintiffs]"—that Plaintiffs "agree[] to provide to OMNI the services set forth in Exhibit 1 of this Agreement." *Id.* at 3 (emphasis in original). Specific "Consulting Services" enumerated in Exhibit 1 include: (1) evaluation of device designs, related instruments, and surgical techniques; (2) participation in research for development of the devices; (3) preparing materials to support the use of the devices, such as surgical models, guidelines, and protocols; (4) preparing publications regarding the devices and publishing written surgical techniques in peer-reviewed journals; (5) participation in meetings, seminars, and symposia to promote the technology and related surgical techniques; (6) training surgeons to use the technology.[7]  [Doc. No. 93-1] at 12-13; [Doc. No. 93-2] at 11-12.

---

[6] The Agreements also stated that Plaintiffs "wish[] to assign to [Defendant] . . . any and all know-how, patent rights, and copyrights relating to such new and/or improved medical devices[.]" *Id.* The parties dispute whether Plaintiffs owned and therefore could have assigned intellectual property rights for the devices, but that dispute is immaterial: Plaintiffs make no legal argument whatsoever regarding intellectual property rights. *See* [Doc. No. 102] at 14-34. They do not contend assignment of intellectual property rights constitutes their performance under the Agreements or that it excuses nonperformance of "Consulting Services." *See id.* At most, Plaintiffs imply in their factual discussion that assignment of intellectual property rights was consideration for "consulting fees and royalties," but they fail to connect that to any issue raised by Defendant or explain why it excuses nonperformance of consulting services. *See id.* at 6, 14-34. Even if they had, unlike the multiple provisions regarding consulting services, the intellectual property provision is not expressly connected to the payment provisions in Exhibit 2 of the Agreements, discussed below.

[7] Plaintiffs deny "that they were required to provide consulting services without qualification and a request from OMNI to do so," as some of the enumerated services required them to "make best efforts" or provide services "reasonably required." [Doc. No. 102] at 7. But other enumerated services do not contain such qualifying language. *See, e.g.*, [Doc. No. 93-2] at 11, ¶ 1.1 ("Consultant shall assist OMNI with the evaluation of new medical devices"); *see also id.* at ¶ 1.1.1 (containing no such qualifying language).

4

Under "Compensation," the Agreements provide, in pertinent part: "[i]n consideration for any Consulting Services performed by [Plaintiffs] *during the term* of th[e] Agreement[s] and any other obligations and performances under th[e] Agreement[s], [Defendant] shall pay [Plaintiffs] pursuant to the terms set forth in 'Exhibit 2' to the Agreements." [Doc. Nos. 93-1, 93-2] at 3 (emphasis added). Within Exhibit 2 itself, the Agreements again state: "in consideration for the Consulting Services performed by [Plaintiffs], [Defendant] shall compensate [Plaintiffs] on an annual basis" as set forth therein. [Doc. No. 93-1] at 14; [Doc. No. 93-2] at 13.

Exhibit 2 contains all the payment provisions. First, under "Annual Payment for Consulting Services," the Agreements state:

2.1  In consideration for [Plaintiffs'] Consulting Services (as set forth in Exhibit 1), OMNI shall compensate [Plaintiffs] according to the schedule below.  Payments will be based on actual services performed and documented in accordance with this agreement.

2.2 Compensation Schedule
$146,958 to be paid by March 31, 2007.  In lieu of this payment, the first 2 calls on 293,916 OMNI convertible notes will be satisfied.
$58,783.00 to be paid by October 1, 2007.  In lieu of this payment, the 3rd call on 293,916 OMNI convertible notes will be satisfied.
$44,259 to be paid by January 1, 2008
$125,000 to be paid by January 1, 2009

[Doc. No. 93-1] at 14; [Doc. No. 93-2] at 13.[8]

---

[8] The parties devote little attention to the "Compensation Schedule" in section 2.2, and there is no dispute regarding the payment amounts set forth under that provision.  As explained below, *see* Section IV(A), *infra*, Plaintiffs contend the references to "OMNI convertible notes" which are not otherwise defined or mentioned in the Agreements warrants consideration of extrinsic evidence, but the payments owed under this provision are not actually at issue: Plaintiffs seek only royalties.

Next, Section 2 of Exhibit 2 includes terms regarding royalty payments for the "Apex Knee System and Apex Modular Knee System" (section 2.3); "Apex Modular Hip System and Apex Modular K2 Hip System" (section 2.4); and the "Apex Interface Cup System" (section 2.5). [Doc. No. 93-1] at 14-15; [Doc. No. 93-2] at 13-14. Those royalty payment provisions provide for a two or three percent royalty from "Net Sales" of each device. *Id.* Each provision states that "[r]oyalty payments will be paid within 60 days of calendar's year end analysis."[9] *Id.* These provisions further state that the "royalty will continue during the life time of the product" and "[t]he royalty payment survives the cancellation of this agreement." *Id.*

Finally, at the bottom of Exhibit 2, and after the royalty provisions, section "3" contains a documentation requirement:

> For the protection of [Plaintiffs] and [Defendant] no payments will be made until all appropriate documentation has been supplied by [Plaintiffs] to [Defendant]. It is the responsibility of the department of Research and Development for [Defendant] to provide direction on the type of documentation necessary and to bring to the attention in advance of payment schedule that there is a non-compliance issue with regard to the documentation required.

[Doc. No. 93-1] at 15; [Doc. No. 93-2] at 14. As it pertains to documentation, the Agreements also provide:

> 11.4    Consulting Fees and Expenses.    In the event of the termination or expiration of this Agreement, [Plaintiffs] shall, within thirty (30) days of the termination date, provide [Defendant] with an invoice for any and all Consulting Fees and expenses payable and due under this Agreement, but

---

[9] The first provision, section 2.3, states that the "[r]oyalty payments will begin in year 2008 and will be paid by 60 days of calendar's year end analysis," while the other provisions do not mention payments beginning in 2008. *See id.* This does not make any material difference, but the Court points this out to ensure the accuracy of the quoted provisions.

which have not been invoiced to or paid by [Defendant], which invoiced Consulting Fees and expenses [Defendant] shall pay within thirty (30) days after its receipt of such invoice.  Any Consulting Fees and Expenses not so invoiced shall be deemed to be irrevocably waived and forfeited by Consultant.

[Doc. Nos. 93-1, 93-2] at 8.

The Agreements also contained a term provision, section 11.1, which provided that they "commence[d] on the Effective Date and continue[d] for a period of three (3) years." [Doc. No. 93-1] at 8; [Doc. No. 93-2] at 7.  There is no dispute Dr. Low's Agreement terminated on December 31, 2008, and Dr. Tkach's Agreement terminated on December 31, 2009.  *See id.*; *see also* [Doc. No. 102] at 8-9, 11, 19-20.  Nevertheless, as explained above, the royalty provisions in Exhibit 2 survived termination of the agreements.[10]

Although Plaintiffs argue they provided consulting services during the terms of the Agreements, they do not actually point to any evidence showing they did.  *See* Resp. [Doc. No. 102] at 8-9, 11-14, 16-17.  Plaintiffs provided an interrogatory response with fifty-nine entries regarding consulting services they contend they performed, but the response does not include any consulting services dated during the years the Agreements were in effect. *See* [Doc. No. 93-5] at 10-12.  Additionally, there are multiple "work activity reports" in the record which list activities Plaintiffs performed, but all those documents involve actions taken after termination Dr. Low's Agreement on December 31, 2008 and after termination of Dr. Tkach's Agreement on December 31, 2009.  *See* [Doc. No. 93-6] (listing services by Dr. Low in August 2009); [Doc. No. 93-7] (listing services by Dr. Low in November

---

[10] In the main body, the Agreements reiterate that the royalty provisions "survive any termination or expiration of th[e] Agreement[s]."  *See* [Doc. No. 93-1] at 9; [Doc. No. 93-2] at 8.

2009); [Doc. No. 93-8] (listing services by Dr. Tkach in 2011); [Doc. No. 93-9] (listing services by Dr. Tkach in 2012); [Doc. No. 93-10] (listing services by Dr. Tkach in 2013); [Doc. No. 93-11] (listing services by Dr. Tkach in 2016); [Doc. No. 93-12] (listing services by Dr. Tkach in 2017); [Doc. No. 93-13] (listing services by Dr. Tkach in 2017).[11]

Plaintiffs testified that the only damages they are seeking are royalties they believe should have been paid from 2014 to present. *See* [Doc. No. 93-3] at 23-24; [Doc. No. 93-4] at 10.[12]  There is no dispute that Defendant paid Plaintiffs $858,479.00 each in royalties from 2014 to 2018.  *See* Mot. [Doc. No. 93] at 14; *see also* Resp. [Doc. No. 102] at 10. However, Defendant's executives met in 2010 to review Plaintiffs' Agreements, at which time Defendants decided to reform the method of calculating Plaintiffs' royalties by deducting costs of goods sold and other expenses, which reduced royalty payments.  *See* [Doc. No. 102-9] at 9-10.  After that, Defendant's General Counsel sent Plaintiffs a letter stating Defendant was paying them royalties based on "net sales."  *See* [Doc. No. 102-10].

As relevant to preliminary consideration of extrinsic evidence under California law applicable to the breach of contract claim, *see* Section IV(A), *infra*, the Court notes that Plaintiffs had prior consulting agreements with Defendant's predecessor, Apex Surgical, LLC related to the one or more of the medical devices that are the subject of the Agreements at issue.  *See* [Doc. No. 102] at 11.  Pursuant to those prior agreements,

---

[11] Defendant includes additional facts regarding Plaintiffs' alleged inability to describe consulting services performed from 2014-2018, [Doc. No. 93] at 10-14, but those facts are immaterial because Plaintiffs' obligations to provide consulting services ended when the Agreements expired.

[12] Dr. Tkach testified he is seeking royalties from 2014-2018, [Doc. No. 93-4] at 10, but the Court references the broader timeframe discussed in Dr. Low's deposition.

Plaintiffs provided initial design and consultation services and assigned any intellectual property rights they had in exchange for royalties based on net sales of the specified products. *Id.* at 11-12. The 2003 agreements between the parties included a "compensation schedule" with specified annual dollar amounts, in addition to a provision for royalties based on net sales for the life of the products. *See* [Doc. No. 102-2] at 2, 6.[13] The Court further addresses these agreements as relevant to the legal issues below.

IV.    **Discussion**

  A. **Breach of Contract**

The parties agree California contract law applies to Plaintiffs' breach of contract claim. *See Union Standard Ins. Co. v. Hobbs Rental Co.*, 566 F.3d 950, 952 (10th Cir. 2009) (when the parties agree what State's laws apply, the Court may "proceed from the same assumption"). Under California law, "the elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011) (citing *Reichert v. General Ins. Co.*, 442 P.2d 377 (Cal. 1968)). Defendants primarily contend Plaintiffs' claim fails on the second element because they are unable to show that they performed consulting services, and they failed to document any consulting services as required under the Agreements. *Id.* at 7, 16-22.

---

[13] Plaintiff only references an agreement entered into by Dr. Low, but Defendant does not contend Dr. Tkach did not have the same agreement. *See* Reply [Doc. No. 115].

Plaintiffs do not directly address the language in the Agreements regarding payment under Exhibit 2, including royalties, in consideration for "Consulting Services performed during the term of th[e] Agreement[s]." *See* [Doc. No. 102] at 14-20. Instead, Plaintiffs contend: (1) the Agreements are ambiguous, and there is a question of fact as to their intended meaning; or (2) the agreements unambiguously provide that Defendant owes royalty payments in perpetuity, and the royalty payment provisions are not dependent on consulting services performed or documented. *See id.* at 15-20. In support of the latter, Plaintiffs point out that the royalty payment provisions survived termination of the Agreements, while the provisions regarding consulting services and documentation of consulting services did not. *Id.*

The Court agrees with Defendants that the royalty payment provisions are expressly and unambiguously tied to consulting services performed during the terms of the Agreements, and Plaintiffs have failed to show they performed. There is no dispute that Plaintiffs' only "Duties and Responsibilities" specified in the Agreements were to provide the listed "Consulting Services." Most importantly, the "Annual Payment for Consulting Services" under Exhibit 2—which includes all the royalty provisions—was "[i]n consideration for any Consulting Services performed by [Plaintiffs] *during the term of th[e] Agreement[s]. . .*" As noted above, Exhibit 2 reiterates that Defendant would compensate Plaintiffs annually "in consideration for the Consulting Services performed[.]" Finally, Exhibit 1, which defines "Consulting Services," expressly states: "*[d]uring the term of this Agreement*, it is understood that [Plaintiffs] shall provide the following services. . . (emphasis added)." Accordingly, the Agreements make clear in multiple

provisions that all payment, including royalties, was in exchange for consulting services performed during the terms of the Agreements.[14]

Accordingly, it is clear Plaintiffs' obligations under the Agreements were to provide and document consulting services during the terms of the Agreements, and the royalty payments are expressly tied to such performance through multiple provisions. This is the only reading of the Agreements that gives effect to all their provisions. *See Colyear v. Rolling Hills Cmty. Assn. of Rancho Palos Verdes*, 318 Cal. Rptr. 3d 805, 816–17 (Cal. Ct. App. 2024) ("The whole of the contract is to be taken together, so as to give effect to every part, if reasonably practicable, and to avoid a construction that would render other provisions surplusage." (cleaned up, citations omitted)); *Carson v. Mercury Ins. Co.*, 210 Cal. App.4th 409, 420, 148 Cal. Rptr.3d 518 (Cal. Ct. App. 2012) ("'An interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable.'").

This is true despite Plaintiffs' argument that the consulting services obligation ended when the agreements terminated, while the royalty provisions survived termination. These terms are entirely consistent with (and indeed dependent on) one another: Plaintiffs agreed to perform consulting services while the Agreements were in effect, and Defendant agreed

---

[14] Additionally, the obligation to document consulting services is found twice in Exhibit 2, and it is clear that no payments would be made unless Plaintiffs documented their services. Plaintiffs contend the first documentation requirement—i.e., "[p]ayments will be based on actual services performed and documented in accordance with this agreement" in Exhibit 2, section 2.1—is specific to the "Compensation Schedule" immediately below. [Doc. No. 102] at 8. But they do not dispute that section 3 of Exhibit 2 further provides that "no payments will be made until all appropriate documentation has been supplied by [Plaintiffs] to [OMNI]." [Doc. No. 93-1] at 15; [Doc. No. 93-2] at 14. That latter provision does not specifically reference (and does not otherwise appear specific to) the compensation schedule.

to pay them royalties for the life of the products in exchange for those consulting services. Plaintiffs have not explained why these provisions cannot be read in harmony, or why the parties' obligations have to conclude at the same time. *See* Resp. [Doc. No. 102] at 15-20.

The relevant question, then, is whether Plaintiffs performed consulting services during the terms of the Agreements.[15]  As explained above, Plaintiffs offer no evidence that they did: although there are numerous exhibits regarding consulting services performed in the years after termination of the Agreements, Plaintiffs offer no evidence showing they performed consulting services while their Agreements were in effect. *See* section III, *supra*.[16]

Accordingly, Plaintiffs have not shown they performed under the Agreements, which is fatal to their breach of contract claim. *See Goldman*, 250 P.3d at 1121; *Salami v. Los Robles Reg'l Med. Ctr.*, 324 Cal. Rptr. 3d 45, 49 (Cal. Ct. App. 2024) (dismissal of a breach of contract claim was appropriate where the plaintiff failed to allege he performed under the contract or was excused from doing so); *see also eOnline Glob., Inc. v. Google LLC*, 387 F. Supp. 3d 980, 988 (N.D. Cal. 2019) (granting summary judgment because the

---

[15] Plaintiffs misconstrue Defendants' argument, asserting: "Defendants do not assert Plaintiffs failed to provide services between 2006 and 2009—the actual term of the Agreement." [Doc. No. 102] at 19.  They are wrong: although they make alternative arguments, Defendants repeatedly quote—and emphasize—the language in the Agreements requiring consulting services "during the term of th[e] Agreement[s]" and argue "[t]here is no genuine dispute that Plaintiffs did not provide the requisite Consulting Services during the term of the Agreement." [Doc. No. 93] at 17-22.

[16] Plaintiffs' interrogatory response does not list any services dated during the terms of the Agreements and therefore does not create a fact dispute as to whether they performed. *See* [Doc. No. 93-5] at 10-12; *see also Anderson*, 477 U.S. at 249 (The Court may grant summary judgment if the nonmovant comes forward with evidence that "is merely colorable . . . or is not significantly probative.").

plaintiff filed to show it performed under the contract); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (If the movant carries their initial burden, "the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." (citations omitted)).[17]

Plaintiffs' arguments are unpersuasive and undeveloped.[18]  First, they fail to explain with any detail how the Agreements are ambiguous, nor have they shown extrinsic evidence may be properly considered in the context of this case.  Plaintiffs do not point to any word or phrase that is ambiguous and that extrinsic evidence would help define.  *See Appling v. State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 777-78 (9th Cir. 2003) (explaining California law permits consideration of extrinsic evidence "only to define the terms in the contract" and declining to consider such evidence because the plaintiffs "have not introduced any extrinsic evidence that interprets specific words" in the provision at issue);

---

[17] Plaintiffs do not contend their non-performance was immaterial and have therefore forfeited any argument on that issue.  In any event, there is no question as to the materiality of Plaintiffs' failure to perform consulting services because that was their only duty under the Agreements.

[18] As noted, Plaintiffs' argument fails to address the operative language discussed above.  Instead, Plaintiffs zero in on other provisions of the Agreements without developing legal arguments as to why those provisions render the contract ambiguous or how they are otherwise material to the issues in this case.  Plaintiffs include unanswered questions and conclusory assertions that invite the Court to develop their arguments for them, which it may not do.  *See State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 885 (10th Cir. 2021) ("[C]ourts do not sit as self-directed boards of legal inquiry and research." (quoting *Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 147 n. 10 (2011))); *C.P.C. v. Boulder Valley Sch. Dist. Re-2*, No. 122CV00564RMRSBP, 2023 WL 8831330, at *3 (D. Colo. Dec. 21, 2023) ("The Court is not obligated to perform legal research on behalf of [a party] . . . nor will the Court make arguments for [a party] that he himself has not raised."); *Lovato v. Mahler*, No. 121CV01986RMRMDB, 2023 WL 2613821, at *3 (D. Colo. Mar. 23, 2023) ("The Court will not make arguments for the parties, nor should the parties expect that the Court will consider arguments that the parties could have made but did not.").

*see also Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.,* 69 Cal. 2d 33, 37 (1968) (the question is "whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible" because "[w]ords . . . do not have absolute and constant referents."); *Brawthen v. H & R Block, Inc.*, 104 Cal. Rptr. 486, 490 (Cal. Ct. App. 1972) (The rule from *Pacific Gas. & Elec. Co.* "does no more than allow extrinsic evidence of the parties' understanding and intended meaning of the words used in their written agreement."); *Vaughn v. Duran*, No. 1:17-CV-00966-NODJ-HBK, 2023 WL 9111162, at *2 (E.D. Cal. Dec. 15, 2023) ("extrinsic evidence and other rules of construction may be used to interpret the words chosen, but not to add, subtract, or vary the words used in the written agreement.").  As explained in *Bionghi v. Metro. Water Dist. of So. California*:

> This is not a case where, for example, a party contended that the words "30 days" were reasonably susceptible of meaning either "30 business days" or "30 calendar days," or that, in the examples given in *Pacific Gas & Electric*, the term "United Kingdom" in a motion picture distribution contract included Ireland, or that the word "ton" in a lease meant a long ton or 2,240 pounds and not the statutory ton of 2,000 pounds.

83 Cal. Rptr. 2d 388, 393 (Cal. App. 1999).  Instead, Plaintiffs ask the Court to: (1) ignore the provisions that state payment is in exchange for consulting services performed "during the term[s]" of the Agreements; and (2) find the royalty payment provisions were for other consideration not set forth in the Agreements.  This is impermissible under California law. *See Pacific Gas & E. Co*., 442 P.2d at 645 ("extrinsic evidence is not admissible to add to,

detract from, or vary the terms of a written contract."); *see also Vaughn*, 2023 WL 9111162, at *2.[19]

Even if considered preliminarily, none of the extrinsic evidence Plaintiffs discuss renders the Agreements reasonably susceptible to any other meaning.  *See AMTAX Holdings 279, LLC v. Montalvo Assocs., LLC*, No. 22-55688, 2024 WL 2749163, at *3 (9th Cir. May 29, 2024) (Courts applying California contract law must preliminarily "consider extrinsic evidence regarding a contract's meaning (without admitting it) and determine whether the contract's language would be 'reasonably susceptible' to the reading in support of which the extrinsic evidence is proffered.").  The only extrinsic evidence Plaintiffs reference in their legal argument is a letter from Mr. Cipolletti around the time the Agreements were signed reflecting his understanding that the royalty provisions were for the "life of the product[s]" and would remain in force even if the contract was not renewed.  *See* Resp. [Doc. No. 102] at 19; [Doc. No. 19-4].  Mr. Cipolletti further offered to "add a specific exclusion of royalties from the termination clause." *Id.*  Setting aside the fact that Plaintiffs do not identify any contract language this letter renders ambiguous, the plain language of the Agreements is entirely consistent with Mr. Cipolletti's understanding that the royalty provisions survived termination of the Agreements.  Nothing in his letter

---

[19] Plaintiffs blankly contend section 11.4 "renders the Agreements ambiguous," but they wholly fail to explain why, and they immediately pivot to an argument that the provisions are unambiguous.  *See* [Doc. No. 102] at 16-18.  Section 11.4 provides for payment of "Consulting Fees and expenses" for amounts invoiced within thirty days of termination of the Agreements.  *See id.*  The Court is unable to discern what Plaintiffs mean in stating Section 11.4 renders the Agreements ambiguous, and it cannot speculate or make that argument for them.  At most, this appears to relate to the documentation issue, *see id.*, but Plaintiffs do not explain why this means they were not required to perform consulting services during the terms of the Agreements.

states, for example, that the royalties are in exchange for anything other than consulting services performed during the terms of the Agreements.  *See id.*  As such, this evidence does not actually help define or otherwise understand the language of the Agreements, nor does it suggest the terms of the Agreements are susceptible to another meaning.

Plaintiffs' discussion of prior agreements, [Doc. No. 102] at 11-13, is similarly undeveloped and does not advance their contract claim.  Although included among their additional material facts, Plaintiffs make no legal argument regarding these prior agreements, and they have therefore failed to explain how those facts are material to any aspect of their breach of contract claim.  *See* Resp. [Doc. No. 102] at 11-20.[20]  Even if they had, the Agreements at issue expressly state that they superseded all prior agreements, communications, or representations, therefore the terms of the prior agreements are of no effect.  [Doc. No. 93-1] at 11; [Doc. No. 93-2] at 10; *see also* Cal. Civ. Code § 1625 ("The execution of a contract in writing . . . supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."); *Grey v. Am. Mgmt. Servs.*, 139 Cal. Rptr. 3d 210, 213 (Cal. Ct. App. 2012) (holding the contract superseded a previous agreement where it stated that it is the "entire agreement" and "supersedes all prior understandings").

---

[20] Moreover, as Defendant points out, Plaintiffs solely referenced and attached the Agreements to their Amended Complaint, [Doc. Nos. 9, 9-1], and they are not permitted to assert new a claim for breach of contract based on those prior agreements in response to a summary judgment motion. *See Navajo Nation Hum. Rts. Comm'n v. San Juan Cnty.*, 281 F. Supp. 3d 1136, 1149 (D. Utah 2017) ("[T]he liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a) . . . does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage." (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004) (per curiam))).

To the extent Plaintiffs offer those prior agreements as extrinsic evidence, they identify no term they contend is ambiguous for which the prior agreements would provide guidance. *See generally* Resp. [Doc. No. 102]. Plaintiffs assert the royalty provisions in the Agreements were based on royalties already earned pursuant to those prior agreements, *id.* at 12, but they identify no term or phrase in the Agreements themselves that actually says so.[21] Moreover, this proposed understanding cannot be squared with the multiple provisions in the Agreements establishing the payment is in exchange for consulting services performed during the term of the Agreements, which Plaintiffs have no explanation for. *See Brawthen*, 104 Cal. Rptr. at 490 (explaining *Pacific Gas. & Elec. Co.* permits consideration of parol evidence to help understand "[w]ords used in the[] written agreement," but that rule "is unconcerned with extrinsic collateral agreements."); *see also Pacific Gas & E. Co*., 442 P.2d at 645 ("extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract.").[22]

Plaintiffs have not shown consideration of extrinsic evidence is proper in the first place. Even if it were, however, the evidence they discuss does not render the Agreements susceptible to another meaning, and it would require the Court to ignore or strike through the language that provides payment, including royalties, was in exchange for consulting

---

[21] Plaintiffs make no argument regarding course of dealing or course of performance.

[22] Even if considered, Plaintiffs do not offer any evidence showing what they actually did to earn royalties even under the prior agreements: they just state as a legal conclusion that they did. *See* Resp. [Doc. No. 102] at 12-13. At most, the prior agreements explain the basis for the specific amounts included in the "Compensation Schedule" in section 2.2 of Exhibit 2, *see* [Doc. No. 102] at 17, but that explanation is immaterial because Plaintiffs do not seek payment pursuant to the Compensation Schedule.

services performed during the terms of the Agreements.  The Agreements unambiguously required Plaintiffs to perform consulting services while they were in effect, and Plaintiffs have not shown that they performed as required.

For all these reasons, Defendants are entitled to summary judgment on Plaintiffs' breach of contract claim.[23]

### B.  Remaining Claims: Accounting, Fraud, and Negligent Misrepresentation

Plaintiffs' remaining claims are for an accounting, fraud, and negligent misrepresentation.  As to the latter two claims, Plaintiffs argue Defendants decided to alter the method of calculating royalties they had been paying Plaintiffs by deducting certain costs and expenses from the calculation of "Net Sales" under the Agreements.  Resp. [Doc. No. 102] at 33.  Plaintiffs contend Defendant's general counsel, Elizabeth Cipolletti, misrepresented to Plaintiffs that Defendant was calculating "Net Sales" consistent with the Agreements, and that they relied on those representations to their detriment.  *Id.* at 33-34.[24]

Throughout this action, the parties have maintained Plaintiffs' fraud claim is governed by Oklahoma law, and that their negligent misrepresentation claim is governed by California law.  *See* [Doc. Nos. 14, 19, 23].  Under Oklahoma law, a fraud claim requires Plaintiffs to show: (1) a false material misrepresentation; (2) made as a positive assertion which is either known to be false or is made recklessly without knowledge of the truth; (3)

---

[23] Because the Court finds in favor of Defendants on the grounds set forth above, it need not address their alternative argument regarding the federal Anti-Kickback Statute.

[24] Plaintiffs' only legal argument regarding these claims is a reference to a California case regarding the discovery rule for tolling the statute of limitations of a misrepresentation claim, *see id.* at 34, which has no relevance to the issues here.  Plaintiffs include no argument whatsoever regarding their accounting claim.  *See id.*

with the intention that it be acted upon; and (4) which is relied on by the other party to his or her own detriment. *Bowman v. Presley*, 212 P.3d 1210, 1218 (Okla. 2009). Under California law, the elements of negligent misrepresentation are: "(1) representation as to a material fact, (2) representation is untrue, (3) regardless of actual belief, the defendant made the representation without a reasonable ground for believing it true, (4) intent to induce reliance, (5) justifiable reliance by plaintiff who does not know the representation is false, and (6) damage." *Guzman v. Nationstar Mortg. LLC*, No. 18cv2531-WQH-RBB, 2019 WL 2436456, at *12 (S.D. Cal. June 11, 2019) (quotation marks and citation omitted).

Plaintiffs' remaining claims fail as a matter of law because they are all fundamentally based on the difference between the amount of royalties Defendant paid and the royalty amounts Plaintiffs contend they were owed under the Agreement. As explained above, however, Plaintiffs have not shown they were entitled to any royalties in the first place. Necessarily, then, Plaintiffs are unable to show: (1) the alleged misrepresentations by Ms. Cipolletti were material (because those representations solely relate to a difference in the amount of royalties they were not owed anyway); (2) that they detrimentally relied on representations by Ms. Cipolletti (because they have not shown that they performed and thereby triggered any duty by Defendant to pay royalties); or (3) that they suffered any actual damages, because the only actual damages they claim are the difference between royalties based on "Net Sales" and what they contend Defendants were paying them due to their deductions.

Accordingly, Plaintiffs' claims for an accounting, fraud, and negligent misrepresentation fail as a matter of law. *See Simonsen v. McClinton Energy Grp., LLC*,

No. 13-CV-635-JED-FHM, 2014 WL 5795494, at *7 (N.D. Okla. Nov. 6, 2014) ("[E]ven assuming it were proper to maintain a fraud claim based upon allegations of breach of contract, the plaintiff has not presented evidence that would establish the existence of any genuine issue of material fact as to required elements of a fraud claim").

## V.   <u>Conclusion</u>

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment [Doc. No. 93] is GRANTED.  Plaintiffs' claims for breach of contract, fraud, and negligent misrepresentation against Defendants OMNI and Mr. Cipolletti are DISMISSED. Defendants' counterclaims remain pending.

IT IS SO ORDERED this 11th day of March, 2025.

SCOTT L. PALK
UNITED STATES DISTRICT JUDGE